# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

IN THE MATTER OF

Peggy Barker, bags or items under the control of
Peggy Barker at the time of contact; Barker's grey Subaru,
Barker's residence at 105 Burkhart Street, Apt C-23; Sitka
AK 99835; storage units owned, paid for, or controlled by
Barker in Sitka AK

Case No. 1:20-MJ-0060-MMS

**Filed Under Seal**



Aug 31 2020

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Ryan S Silva, being first duly sworn, upon oath, depose and state the following:

### BACKGROUND

1.      I am currently employed as a Special Agent (SA) for the Coast Guard
Investigative Service (CGIS), and have been so employed since 2015.   During my employment
with the CGIS, I have been assigned the investigation of criminal matters within the jurisdiction
of the CGIS, with emphasis in the areas of drugs, specifically on the High Intensity Drug
Trafficking Area (HIDTA) task force.   I was a detective with the Sitka Police Department from
2011 to 2019, where I was tasked to investigate criminal activity involved in the trafficking of
illegal drugs.   In my current assignment, I am responsible to investigate all criminal activity
currently under the jurisdiction of the CGIS and HIDTA task force and have conducted
investigations into the trafficking of drugs into Alaska.

2.      The information contained below is from my personal knowledge and experience,
other law enforcement personnel, or from those specific sources set forth herein.

3.      This investigation concerns allegations of violations and attempted violations of
Title 21, U.S. Code (U.S.C.), Section 846, "Conspiracy to Distribute a Controlled Substance;"

Case 1:20-mj-00060-MMS   Document 1-1   Filed 08/31/20   Page 1 of 17


Aug 31 2020

Title 21 U.S.C. Section 841, "Distribution of a Controlled Substance; " by Peggy Barker and others known and unknown to law enforcement.

## PROPERTY TO BE SEARCHED

4.     This affidavit is made in support of an application for a warrant to search Peggy Barker and bags or items Barker has in possession at the time of contact, Peggy Barker's residence at 105 Burkhart Apt. C-23, Sitka AK, Barker's storage unit at Sitka Mini Storage Co, at 310 Jarvis Street, Sitka AK, Barker's storage unit at Triton Properties 1209 Sawmill Creek Road, and Gray 2000 Subaru Forester, bearing Alaska license plate number DPN978.   (see Attachment A, attached hereto and incorporated herein by this reference).   The purpose of the requested warrant is to search for evidence of violations of Title 21, U.S.C., Section(s) 846 and 841.

5.     Since this affidavit is being submitted for the limited purpose of securing warrant(s) to search and seize evidence, fruits or instrumentalities of violations of Title 21, U.S.C., Sections 846 and 841, from the aforementioned property, I have not included each and every fact known to me regarding this investigation.   I have set forth only the facts that I believe are necessary to establish a foundation for the requested search warrant(s).

## ITEMS TO BE SEIZED

6.     All items, records, and information that are evidence, fruits, or instrumentalities of violations of Title 21, United States Code (U.S.C.), Sections 846 and 841, involving Peggy Barker and others, including:

        a.     Methamphetamine, heroin, drug paraphernalia including but not limited to spoons, straws, hypodermic needles, strainers, tooters, mirrors, razor blades, vials, grinders, propane torches, glass pipes, and other pipes used to smoke methamphetamine, and stash containers.

        b.     United States currency, foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks.

Case 1:20-mj-00060-MMS   Document 1-1   Filed 08/31/20   Page 2 of 17

Aug 31 2020

c.        All records, receipts, and other items evidencing the obtainment, secreting, transfer, concealment or expenditure of proceeds acquired through trafficking in controlled substances, including all items evidencing the expenditure of drug related proceeds, namely; receipts, purchase agreements, vehicle titles, warranty applications, homeowners' or renters insurance applications and claims, photographs and/or video recordings of luxury items, jewelry, expensive vacations;

d.        Account statements, account summaries, credit card statements, banking deposit slips, handwritten notes containing account information, account holder and/or amount deposited, money market accounts, and overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications.

e.        Safe deposit box keys and agreements and commercial storage locker keys or records.

f.        Wire transfer documents, receipts and handwritten notes containing wire service tracking numbers, amounts sent and intended pay-out locations.

g.        Cellular telephones, pre-paid long-distance cards, telephone answering machine tapes, computers, electronic storage medium, (Such as cellular telephone flash memory), and removable memory storage. (Computers and electronic storage medium will not be searched without obtaining an independent search warrant following seizure).

h.        Printed flight itineraries, passports including visas, airline tickets, airline ticket receipts, pre-printed airline luggage tags, handwritten notes containing airline confirmation codes, frequent flyer mileage plan cards and summaries, business cards from other areas, hotel receipts and car rental agreements and receipts.

i.        Items tending to establish the identity of the persons in control, including all records, receipts, and other items evidencing who controlled the property identified in Attachment A.

j.        Items tending to establish and document sales of controlled substance and/or other controlled substances, or conspiracy to manufacture, distribute, and/or possess with the intent to distribute controlled substances and/or controlled substances, namely; buyer lists, seller lists, ledgers, tally sheets, pay and owe sheets, price lists, notes and diaries.

       k.      Items tending to establish the identity of co-conspirators, namely; address books, papers and documents bearing handwritten or typed notations of names, aliases and associated telephone numbers, photographs and videotapes.

       l.      Drug distribution paraphernalia, namely; scales, baggies, duct tape, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists, price lists and code sheets.

       m.      Weapons used, carried or intended to be used or carried during and in relation to any drug trafficking crime; to include pistols, revolvers, rifles, shotguns and machine guns and the associated ammunition and ammunition carriers (i.e. magazines, clips, speed loaders, etc…).

       n.      Photographs, video or audio recordings of the aforementioned individual and other drug associates, controlled substances, or assets obtained from the proceeds acquired through trafficking in controlled substances.

       o.      Closed circuit television cameras and associated Digital Video Recording devices.

7.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as cellular telephone flash memory), removable memory storage, and any photographic form.

## TRAINING AND EXPERIENCE

8.      Based upon my training and experience, I know:

       a.  That it is common for persons involved in drug trafficking to acquire large amounts of U.S. currency from their involvement in the drug trade, and to maintain large amounts of U.S. currency on hand, in order to maintain and finance their ongoing illegal activities, as well as, paying bills, acquiring assets and making other purchases;

       b.  that it is common for persons involved in drug trafficking to maintain U.S. currency within their residences, buried on their property, hidden in vehicles and outbuildings, to conceal this U.S. currency from law enforcement authorities;

c.   that it is common for persons involved in drug trafficking to maintain records evidencing their illegal activities, including books, receipts, notes, ledgers, airline tickets, money orders, safe deposit box keys, and other papers relating to the transportation, ordering, possession, sale and distribution of drugs.   The aforementioned books, receipts, notes, ledgers, etc., are frequently maintained at the suspect's residence or business or other property, in either paper or electronic form, or both.   When such records are maintained in electronic form, it is common for them to be stored on stand-alone or networked computers, "laptop" computers, "palm-sized" personal data assistants, cellular telephones, other computer peripherals or electronic data storage devices;

d.   that it is common for persons involved in drug trafficking to maintain addresses or telephone numbers in books, cellular telephones, pagers, electronic data storage devices such as computers and personal data assistants/organizers, or on papers, which reflect the names, addresses and/or telephone numbers of their associates in the drug trafficking organization (DTO);

e.   that it is common for persons involved in drug trafficking to attempt to legitimize their profits from the sale of drugs.   To accomplish this goal, drug traffickers utilize foreign and domestic banks and their attendant services (especially cashier's checks, money orders/drafts, electronic funds transfers/wires, and safe deposit boxes), as well as, real estate and business transactions, both real and fictitious.

f.   that it is common for persons involved in drug trafficking to cause photographs and videos of themselves, their associates, their property and their products to be taken or created;

g.   that it is common for persons involved in the business of drug trafficking to report false names, addresses, telephone numbers and other information to government and law enforcement personnel and agencies, in an attempt to conceal their identity, address and contact information, as well as, the actual use, possession or ownership of significant assets or equipment such as vehicles, aircraft, boats, real estate, rental units, storage facilities, bank accounts, computers, communication devices and other assets or equipment used in or derived from their illegal drug trafficking activities;

h. that it is common for persons involved in the business of drug trafficking to communicate to co-conspirators utilizing electronic means, including text messaging, instant messaging, emails, and telephone calls;

i. that it is common for persons involved in the business of drug trafficking to utilize computers and cellular telephones to search internet package tracking websites (i.e. www.usps.com, www.fedex.com, www.ups.com, www.aml.com, etc...) to determine the location of drug shipments;

j. that it is common for persons involved in the business of drug trafficking to utilize computers and cellular telephones to search internet money service business and financial institution websites (i.e. www.westernunion.com, etc...) to determine the status of money transfers and track bank account information; and

k. that it is common for persons involved in the business of drug trafficking to retain the aforementioned records and items related to their drug trafficking activities and associates for long periods of time, even after their drug trafficking and money laundering activities have terminated.

l. that is its common for persons involved in the business of drug trafficking to utilize firearms to protect themselves and their illegitimate business. Due to the illegitimate nature of drug trafficking, persons involved in this type of business will not utilize law enforcement or the court system to resolve disputes with customers or other drug traffickers. The lack of the use of law enforcement or the court system often causes persons involved in drug trafficking to enforce the law on their own, often through the use of firearms and other weapons.

m. that it is common for persons involved in the business of drug trafficking to install closed circuit television cameras and associated recording devices in order to provide identification of persons outside of the residence being utilized for drug trafficking and to provide the ability to avoid law enforcement action.

## PROBABLE CAUSE

9. On August 13, 2019, law enforcement conducted an interview with a member of the drug milieu, hereinafter referred to as confidential source 1 (CS1). CS1 was a criminal

Page 6 of 20



source of information, who was providing information to law enforcement after being arrested. CS1 hoped to mitigate exposure on charges by providing information. CS1 did not have any criminal convictions but was charged in January 2020 with Misconduct Involving a Controlled Substance in the second degree and fourth degree by the State of Alaska.

10. CS1 identified Peggy Barker as the primary methamphetamine dealer in Sitka, Alaska, reporting Barker was importing methamphetamine and has seen Barker receive about 10 pounds of meth transported to Sitka via a commercial fishing boat. CS1 also identified Robbie Morgan as a member of the Sitka drug world as well as the person who introduced Barker to her source of supply.

11. On September 23, 2019 during a drug investigation in Sitka AK, Stormy Powell provided an interview where she identified Peggy Barker as a source of methamphetamine. Stormy Powell agreed to attempt to purchase methamphetamine from Peggy Barker. On September 24, 2019, using Stormy Powell, law enforcement attempted a controlled-buy of methamphetamine from Barker at her residence at 105 Burkhart Street Apt C-23, Sitka AK. However, Powell became fearful as she was knocking on Barker's apartment door and the buy was not successful.

12. On February 3, 2020, the United States Postal Inspection Service (USPIS) identified a parcel mailed from Sitka, Alaska to Coos Bay, Oregon. The parcel was addressed to William Norton, 64331 Roy Rd., Coos Bay, Oregon 97420, with a return address of Morgan, P.O. Box 6457, Sitka, Alaska 99835. The USPIS applied for and was granted a search warrant for the parcel. Upon opening the parcel, the USPIS discovered $8,650 in United States currency. The currency was hidden inside of a magazine.

13.     On February 7, 2020, the USPIS identified a priority mail parcel mailed from North Bend, Oregon, to Sitka, Alaska.   North Bend is approximately 3.2 miles from Coos Bay, Oregon. The package was addressed to Rob Morgan, P.O. Box 6457, Sitka, Alaska 99835.   The return address was from Robert Johnson, 2056 16th Street, North Bend, OR 97459.   The USPIS applied for and was granted a search warrant for the priority mail parcel.   Discovered inside the priority mail parcel was approximately 9.5 ounces of a black substance that field tested positive for heroin. Based on my training and experience, this amount is indicative of distribution.

14.     On February 10, 2020, the Southeast Alaska Cities Against Drugs (SEACAD) Task Force, consisting of FBI, USPIS, Drug Enforcement Administration (DEA), Coast Guard Investigative Service (CGIS), Juneau Police Department (JPD), and Alaska State Troopers (AST), conducted a controlled delivery operation of the Priority Mail parcel destined for Robbie Morgan.

15.     On February 10, 2020, Robbie Morgan was contacted and ultimately arrested after he took custody of the Priority Mail parcel.   Morgan was indicted and charged on Federal drug charges.

16.     On February 19, 2020, Morgan was interviewed pursuant to a Proffer Agreement with the United States Government.   During the interview, Morgan identified William Norton as Morgan's source for heroin and as the person who had sent the 9.5 ounces of heroin.   Morgan also identified, without prompts from law enforcement, a parcel shipped to Norton containing cash in a magazine.   According to Morgan, the parcel had yet to be delivered to Norton and contained some of the money expected by Norton for purchase of the heroin.



17.     During the proffer interview, Morgan identified Peggy Barker as a methamphetamine distributor in Sitka. Morgan advised that Barker was also supplied by Norton and that Morgan had introduced Barker to Norton. Norton mailed Barker's methamphetamine to Morgan's address. Morgan delivered the packages of methamphetamine to Barker. Morgan received a small portion of methamphetamine as payment for receiving the packages on behalf of Barker. The agreement between Norton, Morgan, and Barker was that Norton supplied Morgan with heroin to sell and Norton supplied Barker with methamphetamine to sell.

18.     Morgan advised that a week or so prior to his arrest, he had received two packages from Norton that each contained approximately three pounds of methamphetamine. Morgan delivered the two packages to Barker. A UPSIS Inspector conducted research and identified a six-pound 12-ounce package that had been mailed from Robert Johnson in Coos Bay, Oregon to Robbie Morgan on January 21, 2020. USPIS also identified a second package shipped on January 21, 2020 that weighed 12 pounds and eight ounces. The second package was also shipped from Robert Johnson in Coos Bay to Robbie Morgan in Sitka. Both packages were delivered on January 24, 2020. Morgan estimated that six pounds of methamphetamine would take Barker a few months to sell.

19.     Morgan believed Barker stored the majority of her methamphetamine in storage units in Sitka. He knew that Barker had a storage unit on upper Jarvis Street and another near the Baranof Brewing building.

20.     On February 24, 2020, law enforcement conducted surveillance on Peggy Barker in Sitka, Alaska. Barker was observed leaving her residence at the Sawmill Creek Apartments, 103 Burkhart Street, at approximately 1:45 pm in a gray 2000 Subaru Forester, Alaska license

plate number DPN978.  Barker then drove to the Cascade Convenience store on Sawmill Creek Road, where she appeared to add air to her tire.

21.     At approximately 1:53 pm, Barker drove the route back to her residence. Instead of making the turn toward her apartment complex on Burkhart Street, she continued straight on Price Street.   Barker then made a U-turn on Price Street and drove back to Sawmill Creek Road, where she turned left onto Sawmill Creek Road.   She continued on Sawmill Creek Road where her speed dropped to approximately 25 miles per hour in a 45 mile per hour zone.   Barker pulled over to the side of Sawmill Creek Road, where she appeared to observe a surveillance unit pass her location. Barker then made a U-turn and drove the opposite direction on Sawmill Creek Road.    Based upon my training and experience, I know that drug traffickers and others who wish not to divulge their destination to law enforcement, will often implement counter-surveillance strategies. Counter surveillance strategies often consist of driving in a non-linear manner or not in a direct point A to point B route and will often drive faster or slower than prevailing traffic in order to identify vehicles mirroring their behavior.

22.     A surveillance unit observed Barker drive on Sawmill Creek Road and then turn onto Halibut Point Road.  Barker continued on Halibut Point Road, but surveillance units lost sight on Barker's vehicle at approximately 2:10 pm.   At approximately 2:13 pm, the surveillance unit located Barker sitting in her vehicle in the Lakeside Grocery Store parking lot on Halibut Point Road.

23.     Because the surveillance unit felt they had been observed by Barker, the unit began to leave the area by driving on Halibut Point Road toward downtown Sitka.  Barker cut off a school bus and pulled into traffic behind the surveillance unit.  Barker followed the surveillance



unit by turning onto Lake Street, over the O'Connell Bridge, and then turned right onto Tongass Drive behind the surveillance unit. The driver of the surveillance unit exited the vehicle and entered the Mt. Edgecumbe Hospital. The driver observed Barker holding her cellphone in a manner that was consistent with taking a photograph. The driver felt that Barker had attempted to take a photograph of the surveillance unit.

24.    At approximately 2:21 pm, Barker departed the Mt. Edgecumbe Hospital campus in her Subaru. Barker drove back over the bridge where surveillance units lost Barker.

25.    At approximately 3:15 pm, a surveillance unit located the Barker's Subaru parked in front of the first trailer on the right-hand side of the Sollar's Trailer Park. Barker was shoveling snow near the Subaru. She stopped shoveling and watched the surveillance unit as it drove into the trailer park. Barker turned as the vehicle passed and watched until it drove around the corner. When the surveillance unit left, Barker again stopped shoveling and watched the surveillance unit as it passed. A different surveillance unit drove past the trailer park entrance multiple times in order to determine if Barker's Subaru was parked in the same location. On two occasions, Barker stood at the top of the hill without a shovel in hand and appeared to be looking down the hill. On one occasion, Barker was observed shoveling snow.

26.    At approximately 6:05 pm, Barker's Subaru was observed parked in the parking lot of the Sawmill Creek apartment complex on Burkhart Street.

27.    On February 24, 2020, management at Sitka Mini Storage, 310 Jarvis Street, was contacted and they advised that Peggy Barker rented a storage unit at their facility. She paid cash

every month for her unit and paid cash for two other units at the facility which were in the names of other people.

28.     On February 26, 2020, the Honorable Matthew M. Scoble, United States Magistrate Judge, District of Alaska, signed a Tracking Warrant authorizing the installation of a tracking device on Barker's Subaru.

29.     On February 27, 2020 at approximately 3:50 am, FBI personnel installed a tracker onto Barker's Subaru while it was parked in the publicly accessible parking lot of the Sawmill Creek Apartment Complex.

30.     Between February 27, 2020 and April 3, 2020, the tracker on Barker's vehicle had been providing details regarding the position of the Barker's vehicle.

31.     The tracking device indicated that during the timeframe of February 27, 2020 through April 3, 2020, the subject vehicle made frequent stops at/near two storage unit facilities. One of the facilities was located on upper Jarvis Street in Sitka, and the other was a facility Triton Properties, located at 1209 Sawmill Creek Road, Sitka. This data was consistent with information provided by Morgan in paragraph 14 above.

32.     The tracking device on the Subaru had also identified residences and other locations, to include one financial institution, where the Barker's vehicle had stopped frequently.

33.     On April 7, 2020, the Honorable Matthew M. Scoble, United States Magistrate Judge, District of Alaska, signed a Tracking Warrant authorizing the continued use of a tracking device on Barker's Subaru.

34.     Because of the COVID-19 pandemic, FBI personnel were unable to travel to Sitka until May 18, 2020.   The tracking device failed to provide updates from April 3, 2020 until maintenance was conducted on May 18, 2020.

35.     On May 18, 202 at approximately 10:00 pm, FBI personnel removed the tracking device from Barker's Subaru while it was parked in the publicly accessible parking lot of the Sawmill Creek Apartment Complex.   Maintenance was conducted on the tracking device and the device was tested by placing it on a FBI rental vehicle.   After verifying proper operation, the tracking device was reinstalled on Barker's Subaru at approximately 10:13 pm.   Barker's Subaru was parked in the publicly accessible parking lot of the Sawmill Creek Apartment Complex when the device was reinstalled.

36.     On May 19, 2020 at approximately 5:09 pm, SA Judy observed Barker's Subaru parked at First Bank in Sitka.   SA Judy observed a male sitting in the front passenger seat and a blonde female sitting in the rear passenger side seat.   Peggy Barker was observed returning to the Subaru from the area of the entrance of First Bank.   The Subaru exited the First Bank parking lot and was next seen parked at the Subway Restaurant in Sitka.   The Subaru was then seen departing the area of the Subway restaurant and drove to a parking lot located under the O'Connell Bridge off Harbor Road in downtown Sitka.   The Subaru parked at approximately 5:25 pm.   SA Judy confirmed the tracker log detailing the three stops.

37.     Intermittent surveillance was conducted on Barker and the Subaru while it was parked at the parking lot under the O'Connell Bridge.   The three occupants were observed at different points outside of the vehicle.   A red Ford Crown Victoria car was parked approximately two car lengths away from Barker's Subaru.   Surveillance did not observe any interaction between the two vehicles.   At approximately 5:45 pm, the red Crown Victoria

departed the parking lot. Immediately after the Crown Victoria departed the area, the Subaru backed out of its parking spot and began to move toward the exit of the parking lot but stopped and remained in the parking lot until approximately 5:49 pm. The two vehicles traveled in opposite directions from each other.

38.     SA Judy conducted loose surveillance of Barker's Subaru after it departed the parking lot under the O'Connell Bridge. The Subaru was observed turning onto Katlian Street where it drove past the area of the Pioneer Bar. The Subaru conducted a U-turn on Katlian Street and passed the Pioneer Bar a second time. A man standing outside of the Pioneer Bar waved the Subaru down and followed the Subaru on foot. The Subaru parked down the street from the Pioneer Bar in front of Totem Square on Katlian Street. The Subaru parked at approximately 5:57 pm. Surveillance was unable to observe any interaction between the Subaru and any other people while it was parked on Katlian Street. The Subaru departed the parking lot occupied only by the same three people who had been in the vehicle during previous observations and drove past the Pioneer Bar at approximately 6:00 pm. Surveillance was then terminated.

39.     On May 20, 2020, the Honorable Matthew M. Scoble, United States Magistrate Judge, District of Alaska, signed a Tracking Warrant authorizing the continued use of a tracking device on Barker's Subaru.

40.     During the period of May 18, 2020 continuing until June 30, 2020, the tracker functioned properly and transmitted tracking data. The data indicated that Barker's Subaru made frequent stops at/near two storage unit facilities. One of the facilities was located on upper Jarvis Street in Sitka, and the other was a facility connected to the Baranof Brewing Complex located at 1209 Sawmill Creek Road, Sitka. The tracking device also identified

residences and businesses where Barker's Subaru had stopped frequently. Additional parking lots and parking areas, to include the Thomsen Boat Harbor, a church parking lot, parks, and pull-outs were identified with yet unknown connections to Barker. The tracking device also recorded stops at the United States Post Office, one financial institution, and stops in a business area near a second financial institution.

41.　　On June 17, 2020 at approximately 12:00 pm, the tracking device indicated Barker's Subaru had stopped on Halibut Point Road. SA Silva recognized the area to be near the residence of Daniel Smith, who was known to law enforcement to be a drug user. SA Silva contacted a homeowner in the area, who was also a former Sitka Police Officer. SA Silva asked if the homeowner was able to observe where Barker's Subaru was parked. The homeowner advised Barker's Subaru was parked at Daniel Smith's residence.

42.　　On June 29, 2020, SA Silva contacted the Sitka State of Alaska Probation Office. SA Silva was advised that Daniel Smith had been sentenced on June 3, 2020 to Probation on a charge of Misconduct Involving a Controlled Substance in the 3rd Degree (MICS-3). According to the Probation Office Smith had failed a urinalysis approximately one month prior to his sentencing. The urinalysis indicated the presence of methamphetamine in Daniel Smith's urine.

43.　　　　On August 10, 2020 SA Frank Reid spoke with a female in the drug milieu in Sitka AK. The female was identified as the blonde passenger in paragraph 35 of this affidavit. The female reported knowledge that Barker was a dealer of methamphetamine in Sitka. The female's parents have located drug paraphernalia, and scales in the female's bedrooms and vehicle.


44.        On June 30, 2020, the Honorable Matthew M. Scoble, United States
Magistrate Judge, District of Alaska, signed a Tracking Warrant authorizing the continued use of
a tracking device on Barker's Subaru.

45.        During the period of July 2, 2020 continuing until July 25, 2020, the
tracker functioned properly and transmitted tracking data, however On July 25, 2020. The data
indicated that Barker's Subaru continued to made frequent stops at/near two storage unit
facilities.   One of the facilities was located on upper Jarvis Street in Sitka, and the other was a
facility connected to the Baranof Brewing Complex located at 1209 Sawmill Creek Road, Sitka.
The tracking device also identified residences and businesses where Barker's Subaru had stopped
frequently.   Additional parking lots and parking areas, to include the Thomsen Boat Harbor, a
church parking lot, parks, and pull-outs were identified with yet unknown connections to Barker.
The tracking device also recorded stops at the United States Post Office, one financial institution,
and stops in a business area near a second financial institution.   During this time period,
Barker's Subaru stopped at the Jarvis Street Storage unit approximately 16 times, sometimes
visiting the storage units multiple times per day. The tracking data continued to show Barker's
Subaru to stop at grocery store parking lots and other parking lots consistent with areas for in-
person meets. On August 11, 2020 the tracker was removed from the vehicle.

46.        On 8/28/2020 SA Silva confirmed with staff of Triton properties, 1209
Sawmill Creek Road that Peggy Barker had a storage unit at Triton properties.

47.        Since August of 2019, Peggy Barker's movements and actions have
remained consistent with that of a drug trafficker. Information has been corroborated through
sources in the dug milieu.

## CONCLUSION

46.     It is the affiant's belief, based upon the facts contained herein and previous training and experience, that Peggy Barker is conducting activity that is consistent with violations of Title 21, U.S.C., Section(s) 846 and 841.

47.     Therefore, it is the affiant's belief, based upon the facts contained herein and previous training and experience, that there is probable cause to believe that evidence, fruits or instrumentalities (see Attachment B, attached hereto and incorporated herein by this reference) of violations of Title 21, U.S.C., Section(s) 846 and 841, are currently concealed on the person of Peggy Barker, bags or items under the control of Peggy Barker at the time of contact; Barker's grey Subaru, Barker's residence at 105 Burkhart Street, Apt C-23; Sitka AK 99835; storage units owned, paid for, or controlled by Barker at the Sitka Mini Storage Company at 310 Jarvis Street, Sitka AK 99835, and Barker's storage unit at Triton Properties 1209 Sawmill Creek Road, Sitka AK 99835.


Ryan S Silva
Special Agent
Coast Guard Investigative Service


Sworn to telephonically and signed electronically on    August 28            , 2020


Honorable Matthew M. Scoble
UNITED STATES MAGISTRATE JUDGE